UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| HOLLI BETH CLAUSER,<br><br>    Plaintiff,<br><br>    v.<br><br>SUNRISE ABA, LLC,<br><br>    Defendant. | No. 23 CV 3707<br><br>Judge Georgia N. Alexakis |

MEMORANDUM OPINION AND ORDER

In June 2022, plaintiff Holli Beth Clauser was hired as recruiting director for defendant Sunrise ABA, LLC ("Sunrise"), a company that provides behavioral health services for children diagnosed with autism. After Clauser and Sunrise parted ways in October 2022, Clauser—who is herself diagnosed with autism—sued under the Americans with Disabilities Act ("the ADA"), alleging that Sunrise had refused her reasonable accommodations for her autism and had demoted and/or terminated her on the basis of her disability. [1]. Sunrise now moves for summary judgment. [48].

For the reasons stated below, the Court grants Clauser's motion for leave to file a surreply [62] and denies Sunrise's motion for summary judgment [48].

**I.    Legal Standards**

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014); Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## II. Background

Unless otherwise noted, the following facts are undisputed. Sunrise provides applied behavioral therapy services to clients with autism. [58] ¶ 1.[1] Sunrise was formed in September 2021, and Clauser was hired as director of recruiting (or perhaps "talent acquisition," the precise title is unclear) on June 27, 2022. *Id.* ¶¶ 2, 6, 8. Clauser reported to Brady Keith, then Sunrise's director of operations, who was also a part owner of Sunrise and the son of another part owner, Cristi Darling. *Id.* ¶¶ 3, 4, 7.

---

[1] In its reply, Sunrise asks the Court to strike a number of Clauser's responses to Sunrise's Local Rule 56.1 statement under Local Rule 56.1(e)(2), for setting forth "new facts" and for failing to respond to Sunrise's stated facts with sufficient specificity. [60] at 3–4. The Court has "discretion to require strict compliance" with the Local Rules, *F.T.C. v. Bay Area Bus. Council, Inc.*, 423 F.3d 627 (7th Cir. 2005), and it exercises its discretion not to do so here. While some of Clauser's responses are less concise and direct than contemplated by Local Rule 56.1(e), the Court was still adequately able to discern what facts were being admitted and denied and so elects to resolve the motion before it on the merits rather than a technical violation of the rules. Still, the Court admonishes Clauser's counsel to better adhere to the Local Rules regarding summary judgment going forward. Relatedly, Sunrise asks the Court to strike a number of Clauser's Local Rule 56.1(b)(3) statements of additional material facts because they assert multiple separate and distinct facts. [60] at 5. The Court agrees that Clauser has improperly "padded" many paragraphs with multiple facts, likely in an attempt to circumvent the 40-paragraph limit in Local Rule 56.1(d)(5). Again, the Court will proceed to resolve the case on the merits, although it admonishes Clauser's counsel for not simply seeking leave to submit additional statements of material fact. Finally, Sunrise contends that several of Clauser's responses or additional facts lack record support. *E.g.*, [60] at 3–4. In resolving defendant's motion, the Court has relied only on statements asserted by either party that are supported by the record. *See* LR 56.1(d)(2) ("The court may disregard any asserted fact that is not supported with [a] citation" to specific evidentiary material that supports it.).

Clauser had been diagnosed with autism in 2017. [61] ¶ 6. Because of her autism, Clauser frequently asks for extra clarification in communication, and sometimes needs extra time to process information. *Id.* Clauser informed Keith of her autism in "late August or early September," and on September 9, 2022, says that she asked Keith to confirm their conversations about her tasks in writing "for clarity around task priority and for later reference." [61] ¶ 6; *see, e.g.*, [58-4] at 197:18–198:22. Sunrise denies that Clauser asked for anything in writing. [61] ¶ 6; *see* [52-1] at 26:5–10.

Then, around September 13, 2022, Clauser asked Keith for a career coach to help her with communications. [61] ¶ 7. Clauser asserts this was a request for accommodation for her autism, something Sunrise denies. *Id.* On September 19, 2022, Clauser says she raised her request for a career coach again and now requested an accommodation form. *Id.* ¶ 12; *see, e.g.*, [58-4] at 195:1–6. The September 19 request came after a "hurtful conversation" with another Sunrise executive, who Clauser says then began to remove Clauser from meetings. [61] ¶ 12; *see also* [58] ¶ 28. Clauser related the conversation to Keith, who suggested that he, Clauser, and the executive discuss the issue. [58] ¶ 28. Sunrise denies that Clauser's "previous request for a job coach had [] been made as a request for disability accommodation." [61] ¶ 11; *see, e.g.*, [52] at 25:14–21. But the parties agree that Keith attended one meeting with Clauser and the career coach on September 22. [61] ¶¶ 7, 13. During the meeting, Clauser described "her challenges with leadership not prioritizing her tasks and the lack of clarity surrounding aims and objectives." *Id.* ¶ 13. Clauser describes Keith as

3

"distracted" during the meeting, which Sunrise denies. *Id.* Keith ended the meeting early, *id.* ¶ 13, and nothing in the record indicates that Keith took any further action regarding the coach. Keith did not discuss this request with anyone else at the company. *Id.* ¶ 7.

With respect to her role at Sunrise, soon after being hired, Clauser took on additional responsibilities at Sunrise, though the parties dispute whether this was at Keith's direction or on Clauser's own initiative. [58] ¶ 9. According to Clauser, Keith had by early August requested that Clauser "build the operational infrastructure of the company," including overseeing the Client Services, Onboarding, Intake, and Human Resources departments, as well as managing clinical directors and writing policies and handbooks. [61] ¶ 4; *see also* [58-4] at 56:9–12 (Q: "When was it that [Keith] asked you to assist or weigh in on HR and legal questions?" A: "That started in mid-August."); *id.* at 59:7–9 ("[Keith] had also mentioned he wanted me to look and diagnose what was wrong with [the] intake department."). Sunrise denies that Keith asked her to assume responsibility for this expansive portfolio and instead asserts that she did so on her own. [61] ¶ 4; *see also* [52] at 106:12–13 ("She was never requested to create anything outside of Recruiting."). Regardless, as a result of these expanded duties, Sunrise hired several employees to report directly to Clauser. [58] ¶¶ 11, 13. Sunrise also hired Clauser's husband, Mark, shortly after she took charge of recruiting, first as a part-time employee and then as a full-time employee. [61] ¶ 5.

Because of her expanded role, Clauser says she began discussing a promotion with Keith. *Id.* ¶ 8. In Clauser's account, this resulted in a promotion in September

4

2022 to "Vice President of People Operations," after which Keith sent Clauser a signed confirmation of the promotion, including a salary increase. *Id.* Clauser includes the confirmation letter with the signatures of both Clauser and Keith, as well as an email from Keith to the company announcing Clauser's new title. [58-10]; [58-14]. This record evidence aside, Sunrise denies that Keith and Clauser ever discussed a promotion or that the promotion ever happened. [61] ¶ 8. Sunrise denies that Keith signed the confirmation letter, *id.* ¶ 8 (citing [52] 57:12–58:8), though admits he sent the email with the new title, *id.* ¶ 10.

Turning to October 2022, the parties' accounts on how matters evolved continue to diverge. Yet, as with the pre-October 2022 events, both versions find support in the record, including from Clauser's and Keith's deposition testimony.

In Sunrise's account, the company—which describes itself as a "startup"—was "in financial trouble" and in October "implemented an organizational restructure due to budgetary reasons." [58] ¶¶ 32, 34. As part of this restructuring, Sunrise says that Keith determined that Clauser should stop handling intake, scheduling, and HR, and instead focus solely on recruitment. *Id.* ¶¶ 37–41. Sunrise also says it terminated three employees at around this time, and "restructured" a number of employee positions, including that of Clauser's husband, who became a part-time employee again. *Id.* ¶¶ 42–51. Sunrise hired a number of new employees during this period, though emphasizes that "90% were therapists or clinical staff." *Id.* ¶ 52.

Clauser was not invited to an October 10, 2022 meeting on the topic of the restructuring and asked Keith by text message if the restructuring concerned her. *Id.*

¶¶ 36, 53. Keith responded that the meeting did not concern Clauser. *Id.* ¶ 54. In a call later that day, Keith "told [Clauser] good news, he was going to put her back focusing 100% on talent acquisition" and that "he was going to change [Clauser]'s position to what it had originally been." *Id.* ¶¶ 55–56. Keith also told Clauser that he was removing at least two of her direct reports. *Id.* ¶ 57. Clauser reacted negatively to this news, and Keith "found it hard to read [Clauser's] response during the call because [Clauser] was upset and crying." *Id.* ¶ 59. After the conversation, Clauser asked Keith for contact information for Sunrise's attorney. *Id.* ¶ 63.

Keith told Clauser to take time off, which she did. *Id.* ¶¶ 60–61. According to Sunrise, at some point Keith "had to sign in to [Clauser]'s account to recover files and documents that she had deleted" and in doing so locked Clauser out of her account. *Id.* ¶ 64. When Clauser inquired why she was locked out, Sunrise says Keith sent her a password reset link, which Clauser denies. *Id.* ¶ 65.

Cristi Darling, Keith's mother and another part owner of the company, emailed Clauser shortly after the October 10 restructuring meeting to inform Clauser that her job was being "restructured" and that Sunrise was "eager to get you back to the Recruiting Director role" which "is the position we hired you for." *Id.* ¶¶ 66–67. Clauser asked Darling for a job description (which Clauser says she needed to obtain an accommodation form from a medical provider), but Sunrise did not provide one. *Id.* ¶¶ 68, 70. Clauser also asked several times for written confirmation that she had been demoted, but Sunrise did not provide this and Keith "never told [Clauser] that he was going to demote her or change her title or decrease her compensation." *Id.*

6

¶¶ 62, 68. In fact, Keith denies that Sunrise demoted anyone as of October 2022. *Id.* ¶ 69.

Darling did not resume communications with Clauser until two days later, October 12, 2022, "because she wanted to give [Clauser] the time off that she had requested." *Id.* ¶ 73. This, in Sunrise's account, is also why Clauser did not receive a job description. Darling says she wanted Clauser's input for the job description*, id.* ¶¶ 70–72, and "[w]ithout a meeting with [Clauser], [Darling] could not provide a job description to get accommodations," *id.* ¶ 74. According to Sunrise, Clauser "ultimately rejected the offer to return to the Recruiting Director role and responsibilities as offered by Sunrise." *Id.* ¶ 75.

Clauser's account of her final weeks at Sunrise is quite different. Clauser asserts that Keith "began his effort to drive her out of the company on October 6, 2022" by telling two of her direct reports to communicate with Keith and another manager instead of Clauser. [61] ¶ 17. Clauser expressed concerns about this to Keith. *Id.* On October 9, 2022, Clauser says that Keith called another employee, Jamie Gordon, and revealed that he was "calling to tell [Gordon] that we are letting [Clauser] go," but that Gordon "need[ed] to keep this confidential." *Id.* ¶ 18; *see* [58-

7

26] ¶ 3. Sunrise denies the conversation with Gordon occurred, [61] ¶ 18, but all agree that Clauser was not invited to the October 10, 2022 restructuring meeting. *Id.* ¶ 19.[2]

On October 10, after the restructuring meeting, Clauser was informed that she was losing her direct reports—though Sunrise says only for tasks outside of recruiting—and says she asked for clarification about both her requested accommodation and her role going forward. *Id.* Sunrise "denies that Plaintiff clearly asked for clarification relating to her direct reports, accommodations, or responsibilities." *Id.* Because Clauser felt like she was being "pushed out," she asked Keith for the contact information for a Sunrise attorney. *Id.* ¶ 20. Clauser also alleges that at this time "Keith removed [Clauser]'s access to the company server," and that she informed Keith that "I'm embarrassed, hurt, and do not condone or support any

---

[2] Clauser's response relies in part on a declaration from Jamie Gordon, who was senior clinical director at Sunrise in 2022. *See, e.g.,* [58] ¶ 68; *see also* [58-29] (Gordon declaration). Sunrise argues that the Court should disregard Gordon's declaration "for failure [by Clauser] to properly disclose discoverable information under Federal Rule of Civil Procedure 26(a)(1)." [60] at 6. In particular, Sunrise contends that Clauser represented only that Gordon had "general knowledge about [Clauser's] employment with [Sunrise] and the October 10, 2022 restructuring meeting," but "did not disclose Gordon's personal knowledge relating to specific details about [Clauser's] employment, or Gordon's interactions with Brady Keith." *Id.* Clauser moved to file a surreply, which the Court has considered in evaluating this dispute. [62]; [62-1]. The Court agrees with Clauser that Rule 26(a)(1) "only requires disclosure of the subject matter of discoverable information, which is not the same as the anticipated subject matter of trial testimony." [62-1] at 2 (citing *Morales v. Randolph Place Residences Condo. Ass'n*, 22 C 5144, 2024 WL 4625311, at *2 (N.D. Ill. Oct. 30, 2024)); *see also Mossberger v. Kochheiser*, 14 C 7284, 2016 WL 2593359, at *4 (N.D. Ill. May 5, 2016) (Rule 26(a)(1) "does not require a non-expert witness to submit in advance of trial what testimony he or she may offer."). The cases Sunrise cites are distinguishable. For example, it is true that *Paldo Sign & Display Co. v. Unified Mktg., LLC*, 13 C 1896, 2017 WL 951313, at *4 (N.D. Ill. Mar. 10, 2017), concluded that the plaintiffs in that case "were prejudiced because they were not put on notice that [a witness] possesses information pertinent to the case." But the witness at issue in *Paldo Sign* had not been disclosed as a potential witness at all, *see id.*, unlike Gordon. The Court therefore declines to strike the Gordon declaration. But, in any event, the Gordon declaration does not change the Court's analysis.

8

[Applied Behavior Analysis] company silencing and mistreating me. I need to know about my accommodations before I sign back in this day and the coming days." *Id.* ¶ 21.[3] The parties disagree over whether Keith ever sent a password reset link. *Id.*

Also on October 10, Darling instructed Keith to stop responding to Clauser because she was a "disgruntled employee." *Id.* ¶ 22; *see* [53] at 73:7–20. Clauser also asserts other employees were instructed to "stop all communication with her," though Sunrise denies this and says only a single employee received this instruction. [61] ¶ 22. Darling then sent Clauser an email stating that "with current messages from you, it's unclear whether you are declining or resigning your role as Recruiting Director for Sunrise." *Id.* ¶ 23. Clauser responded by asking about her promotion, her requests for accommodation, her experience of being "locked out" and isolated from coworkers, and asked Darling to "[p]lease confirm that the company has decided to part ways, has broken my updated contract that was signed by [Keith], and is refusing to discuss my accommodation." *Id.* ¶ 24; [58-17].

Later that same day, Darling replied: "Your Sunrise account has in fact been paused, only to allow you the time off you have requested. Please let us know if you

---

[3] Sunrise objects to Clauser's declaration as "self-serving testimony not otherwise supported by the record." [61] ¶ 21; [58-25] (Clauser declaration). But this misunderstands the rule. "The record … may include the self-serving affidavit itself, provided that the affidavit meets the usual requirements for evidence on summary judgment—including the requirements that it be based on personal knowledge and that it set forth specific facts showing that there was a genuine issue for trial." *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 504 (7th Cir. 2004). In other words, "[a] self-serving affidavit *should* be considered … when it meets the requirements of evidence on summary judgment." *Id.* at 506 (emphasis added). Sunrise does not explain why Clauser's declaration does not meet these requirements, nor can the Court see any reason why it does not. The Court concludes it may rely on Clauser's declaration as evidence at summary judgment.

9

intend to come back as the Recruiting Director, if it is your preference, we can schedule a call to discuss your roles and responsibilities when you return." [61] ¶ 25. Clauser responded as follows:

> As I mentioned, I will need the accommodation form to avoid retaliation from happening again due to my diagnosis and pointing out legal and ethical issues. If you could please send this new description along with the accommodation form I can make a more educated decision on how to proceed. I would also like in writing that this would be a demotion from the promotion I received in September. Is this possible?

*Id.* ¶ 26. Clauser asserts that Darling did not respond, while Sunrise asserts that Darling responded by attempting to arrange a call with Clauser. *Id.* Again, both versions of events are supported by the record. *E.g.*, [58-3] at 63:11–14; [58-17].

On October 11, the next day, Clauser wrote to Darling: "Please let me know what the job description is and the salary. The accommodation can be filled out by my doctor this week." [61] ¶ 28; [58-17]. On October 12, Darling sent an email to an administrative listserv that included Clauser's husband, requesting assistance "with a disgruntled employee." [61] ¶ 29. The parties dispute whether this was sent in error. *Id.* Later in the day, Clauser sent Darling another email saying that she had procured an "ADA accommodations form" from a different organization but that her physician needed an updated job description. *Id.* ¶ 30. Less than an hour later, Keith informed Mark that he would be moved from full-time to part-time work, an offer Mark rejected because he viewed it as a retaliatory demotion and a part of Keith's plan to terminate Clauser. *Id.* ¶¶ 31–32; *see, e.g.*, [58-20]. Sunrise denies the change was a demotion or had anything to do with Clauser. [61] ¶ 31; *see, e.g.*, [52] at 99:22–23. Mark was also locked out of his work account at some point on October 12. [61] ¶ 31.

10

> Just before 6 p.m. on October 12, Darling responded to Clauser:
>
> Thank you for your emails, apologize for any delay in my response, I wanted to grant you the time off you requested without any interruptions. We are looking forward to speaking to you about the job requirements and our needs moving forward. Are you available to schedule a call for Friday morning? Look forward to hearing from you and appreciate your time.

*Id.* ¶ 34. Clauser, who believed that Darling was not acting in good faith, replied with the following:

> This is a change in organizational behavior…. You are still refusing to give me time to process this new information. I have asked for accommodations and an updated job description. My time off I requested due to the mental stress caused by what I witnessed at Sunrise. Furthermore, you are now harassing and attacking my husband. You have chosen to target us after I expressed concerns about illegal behavior and misrepresentation to insurance companies. I will not be accepting a position with a company that engages in bullying behavior…. Please cease and detest [sic] all communication to me and about me. Employees have shared my name is being slandered and I respectfully ask that be rectified immediately.

*Id.* ¶ 36.[4]

Clauser filed the instant complaint on June 12, 2023, claiming that Sunrise had violated her rights under the ADA by ignoring her requests for reasonable accommodations and by demoting and terminating her on the basis of her disability. [1] ¶¶ 48–49. Sunrise now moves for summary judgment. [48].

---

[4] Sunrise again objects to Clauser's declaration as "self-serving," but Clauser's declaration remains valid evidence for the purpose of summary judgment. *See supra* note 3.

11

**III.    Analysis**

    **A.    Reasonable Accommodation**

The ADA provides that covered employers shall not "discriminate against a qualified individual with a disability on the basis of disability in regard to … the hiring, advancement, or discharge of employees, … and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). "Discrimination can take the form of … failing to make reasonable accommodations to the known limitations of the employee." *Youngman v. Peoria Cnty.*, 947 F.3d 1037, 1041–42 (7th Cir. 2020) (citing 42 U.S.C. § 12112(b)). To prevail on her failure-to-accommodate claim, Clauser must show that (1) she was a qualified individual with a disability, (2) Sunrise was aware of her disability, and (3) Sunrise failed to reasonably accommodate her disability. *Id.* Sunrise does not dispute that it was aware of Clauser's disability, so the Court addresses the first and third prongs.

A "qualified individual" is one who "can perform the essential functions of the employment position." 42 U.S.C. § 12111(8). Sunrise argues that Clauser's "requests for the type of accommodations she asked for, evidences her inability to perform the essential functions of the expanded role she was performing." [49] at 10. In particular, Sunrise argues that Clauser's request for "written feedback on her performance … was unreasonable" because Keith "was occupied with running a startup company." *Id.* at 11. Clauser responds that this "tortures the record," as Keith had stated that at the time Clauser requested an accommodation Keith "had no concern with [Clauser]'s performance." [59] at 12 (citing [58] at 29–30 ¶ 11). And, indeed, Sunrise points to no performance issues beyond the fact of Clauser's requests. [49] at 11–12.

12

The Court finds that there is a genuine issue of material fact around whether Clauser was a qualified individual. First, Sunrise acknowledges that Clauser had taken on an escalating role at the company during her tenure, though disputes whether this was on her own initiative. But, despite these increased responsibilities, nothing in the record indicates that Clauser had any performance issues. If anything, the record establishes the contrary point. For instance, Keith testified that he believed Clauser "was doing a phenomenal job." [52] at 62:3–8; *see also id.* at 59:16 – 17 ("Again, I want to state that I never had any issue with Holli's performance.").

Second—and somewhat surprising, given the nature of the claim here—nothing in the record indicates what the essential functions of Clauser's job actually were. Indeed, the record before the Court suggests that at the time Clauser left the company neither party understood Clauser to have a job description. What constitutes a job's essential functions is a factual question, *see Brown v. Smith*, 827 F.3d 609, 613 (7th Cir. 2016), and while "[t]he employer's judgment is a factor, and an important one, [] it is not necessarily decisive." *Tate v. Dart*, 51 F.4th 789, 794 (7th Cir. 2022); *see also* 29 C.F.R. § 1630.2(n)(3) (listing factors).

But while Sunrise argues that Clauser "simply could not perform the essential functions of the expanded role," [49] at 11, it does not specify those functions. And without knowing what the essential functions of Clauser's job were, the Court cannot conclude that Clauser was incapable of performing them. *See Kotaska v. Fed. Express Corp.*, 966 F.3d 624, 629 (7th Cir. 2020) (only after the essential functions were established did the burden of persuasion shift to nonmovant plaintiff on summary

13

judgment "on the question of whether she was a qualified individual"); *id.* at n.2 ("FedEx showed that loading and unloading packages up to 75 pounds is an essential function, and it is Kotaska's burden to show she could perform that function."); *see also Lewis v. City of Union City, Georgia*, 934 F.3d 1169, 1185 (11th Cir. 2019) ("As we have held that there is a genuine dispute of material fact on what the essential functions of a UCPD detective are, we certainly cannot resolve the question of whether she can perform those as-yet-undefined essential functions safely.").

With regard to the reasonableness of the requested accommodations, Sunrise first disputes that "Clauser ever asked for an accommodation due to her disability." [49] at 3. But Sunrise does not deny that Keith was aware of Clauser's autism diagnosis; that she asked for written task confirmation, written performance reviews, and a career coach; and that Clauser repeatedly used the term "accommodation" in making these requests. *See, e.g.*, [61] ¶¶ 11, 21, 24, 26; [58-16]; [58-17]. A jury could reasonably conclude from this evidence that Clauser had made a request for a disability accommodation. Moreover, the reasonableness of such a conclusion is underscored by the fact that Clauser directed her requests to the director of operations of a company that provides behavioral health services for individuals diagnosed with autism.

Sunrise next argues that the requested accommodations were unreasonable. [49] at 11–12. "Whether a requested accommodation is reasonable or not is a highly fact-specific inquiry and requires balancing the needs of the parties" *A.H. by Holzmueller v. Illinois High Sch. Ass'n*, 881 F.3d 587, 594 (7th Cir. 2018) (cleaned

14

up). Sunrise contends that "[a]s a startup company, a fact no one denies, it is unfathomable that [Sunrise] would have to hire or appoint someone to take notes for a director-level employee or … an employee at the Vice President level." [49] at 11. The Court understands "notetaking" to refer to Clauser's request that "Keith [] confirm their conversations about her tasks in writing." [61] ¶ 6. Likewise, Sunrise contends that written performance feedback from Keith was "unreasonable" because Keith "was occupied with running a startup company." *Id.* Indeed, Sunrise argues that Clauser's request for written feedback was "essentially [a request] that someone check her work and teach her how to do her job" and seems to suggest that such a request might be categorically unreasonable. [49] at 11–12.

Sunrise does not explain why the fact of working at a "startup"—which Sunrise appears to define as any company that "had not yet been in operation a full year"—precludes these accommodations. *Id.* at 11. Sunrise gives no details on Keith's schedule beyond that he was "occupied with running a startup." *Id.* Sunrise also does not explain why only Keith could provide Clauser with confirmation about her tasks or written feedback on her performance, and the record reflects that Clauser proposed other methods for implementing her requested accommodations. *See, e.g.*, [58-4] at 199:23–200:18; 204:16–22. And neither written instructions nor written feedback are uncommon in an office-based workplace, even one that is as fast-paced as Sunrise suggests the workplace here was. Without more, the Court cannot conclude as a matter of law that Clauser's request for written confirmation of her tasks or written performance feedback were not reasonable accommodations. Determining whether

15

an accommodation is reasonable is "a highly fact-specific inquiry" *A.H.*, 881 F.3d at 594, and there is a dearth of facts before the Court.

The Court likewise cannot conclude that Clauser's request for a career coach was unreasonable. The Seventh Circuit has expressly declined to conclude that "permanent full-time job coaches" are per se unreasonable and noted that "a jury could find a full-time job coach to be a reasonable accommodation for [an employee] if he or she did not perform the essential functions of [the employee's] job. *Equal Employment Opportunity Comm'n v. Wal-Mart Stores, Inc.*, 38 F.4th 651, 659 (7th Cir. 2022); *see also id.* ("Contrary to what Walmart argues, it's not an open question whether a permanent job coach can be a reasonable accommodation."). This is "[b]ecause our case law bases the definition of reasonable accommodation on the circumstance-specific question of essential functions." *Id.* As discussed above, the record does not reflect what the essential functions of Clauser's role actually were. Even setting that aside, nothing in the record indicates that the career coach Clauser requested would have participated in recruiting, onboarding, writing policies and training guides, human resources, or any of the other job functions identified by either party. There is thus a genuine dispute of material fact around whether the career coach was a reasonable accommodation.

Sunrise also argues that while Clauser "asked for several accommodations, [] Sunrise was not required to provide them all" because "the law also does not require an employer to provide the particular accommodation the plaintiff thinks is best." [49] at 13 (citing *Fonseca v. Spraying*, 466 F. Supp. 3d 834, 849 (N.D. Ill. 2020)). This

16

is true, but under the ADA "an employee's request for an accommodation requires the employer to engage in a flexible, interactive process to identify a reasonable accommodation." *Fonseca*, 466 F. Supp. 3d at 848 (citing *Beck v. University of Wisconsin Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996)). Sunrise contends that it met its obligation to engage in the interactive process because Clauser and Sunrise "had discussed Plaintiff's needs more than once," Keith had "agreed to meet with Plaintiff's proposed career coach," and Keith had also offered "to provide [Clauser] with any extra coaching she needed" after declining to retain the career coach. [60] at 7–8. But Sunrise does not explain why that was a reasonable accommodation under the circumstances, and Clauser argues, with support from the record, that Keith repeatedly ignored her requests and never actually responded to her request for a coach, [59] at 11–12; [58-2] at 93:10 – 14 (Q: "And did you ever get back to her and tell her you would or would not get a coach for her?" A: "*No*, because we were supporting her. I was trying to figure out what other stressors were stressing her out.") (emphasis added).[5] So there is a genuine dispute of material fact over whether Sunrise met its obligations.

B. **Demotion and Termination**

Clauser argues that her alleged demotion violated the ADA. [59] at 12. Sunrise does not discuss this theory of liability, though does dispute that Clauser was promoted in the first place. [49] at 12. Sunrise relies on Keith's deposition testimony that Clauser was never promoted to vice president, while Clauser points to her own

---

[5] The Court notes that Keith's offer of personal coaching is in some tension with Sunrise's earlier argument that Keith was too busy to provide written performance feedback.

testimony and communications from Keith, including a company-wide email, using the title. [58] ¶ 62; [61] ¶¶ 9–10. It is not the Court's job at summary judgment "to weigh evidence, make credibility determinations, resolve factual disputes and swearing contests, or decide which inferences to draw from the facts," *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014), so this conflict creates a genuine dispute over the factual issue of Clauser's promotion.

There is likewise a genuine dispute of material fact over whether Clauser was demoted. Keith "did not consider [Clauser's] job restructure as a demotion" and never told Clauser "that she was being demoted, that her title would change, or that her pay would be affected," [49] at 9–10. For her part, Clauser points to the undisputed facts that her responsibilities were "restructured" and her direct reports taken away—at least in some capacity. [59] at 12–13. A jury could reasonably find that reduced responsibilities, fewer direct reports, and a title change constitute a demotion.

So too with the issue of Clauser's termination. Sunrise argues that Clauser "has not presented any facts establishing that she was subjected to egregious conduct warranting a constructive discharge" and thus has failed to show that she was terminated at all. [49] at 14. Clauser argues that her removal from position of Vice President of People Operations—along with being locked out of her work account, having her direct reports removed, and, in her version of events, other employees being discouraged from speaking to her—constitute a direct termination. [59] at 13.

18

In the alternative, Clauser argues that these facts support a theory of constructive discharge. *Id.* at 13–14.

The Court agrees with Clauser that the record creates a genuine dispute of material fact around whether she was constructively discharged. Constructive discharge can occur in two forms: (1) when "an employee resigns due to alleged discriminatory harassment," and (2) "[w]hen an employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated." *Wright v. Illinois Dept. of Children & Family Services*, 798 F.3d 513, 527 (7th Cir. 2015) (quoting *EEOC v. Univ. of Chicago Hosps.*, 276 F.3d 326, 332 (7th Cir.2002)). Clauser advances the second theory, [59] at 14–15, for which she must "sufficiently demonstrate[] that a reasonable employee standing in [the plaintiff]'s shoes would have believed that had she not resigned, she would have been terminated." *Univ. of Chicago Hosps.*, 276 F.3d at 332.

The parties agree that Clauser had been excluded from the "restructuring" meeting and locked out of Sunrise computer systems, that Sunrise had removed significant portions of her responsibilities, and that Clauser's husband had also locked out of the company systems after having his hours reduced. A jury could reasonably conclude from this that an employee in Clauser's position "would have believed that had she not resigned, she would have been terminated." *Id.*; *see also id.* ("Most significantly, when Leyva arrived at work, her belongings were packed and her office was being used for storage."); *Asadollahi v. SpineCraft, LLC*, 20 C 2039,

19

2021 WL 722826, at *1 (N.D. Ill. Feb. 23, 2021) (the "determination of whether a constructive discharge occurred is fact-intensive").

### IV. Conclusion

For the foregoing reasons, the Court grants Clauser's motion for leave to file a surreply [62] and denies Sunrise's motion for summary judgment [48].

The parties are directed to appear at a status hearing for 10/21/25 at 9:30 a.m. At that status hearing, the Court will set pretrial deadlines and a trial date. In advance of the hearing, the parties are directed to meet and confer on potential trial dates. The parties are also directed to meet and confer on the possibility of settlement and to come to the status hearing prepared to report on that possibility as well as the parties' interest in a settlement conference.

                                                               Georgia N. Alexakis
                                                                United States District Judge

Date: 9/29/25